IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 92-1060

_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BOBBY GLEN WIMBISH,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Texas
_____

(December 17, 1992)


Before WILLIAMS, HIGGINBOTHAM, and BARKSDALE, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:


Bobby Glen Wimbish pleaded guilty to one count of bank fraud and to one count of possession of stolen mail. From stolen mail, Wimbish had obtained personalized checks and bank statements. He deposited forged checks with several banks and then received as cash back a portion of each deposit. At sentencing, Wimbish objected to the district court's use of the face value of the forged checks to determine loss under the Sentencing Guidelines. The court overruled Wimbish's objection and imposed sentence of two concurrent terms of 30 months in prison followed by five years of

supervised release.    Wimbish challenges the district court's calculation of his sentence under the guidelines.   We affirm.

## I.   FACTS AND PRIOR PROCEEDINGS

In June and July 1991, Bobby Glen Wimbish purchased personalized blank checks and bank statements.   They had been stolen from the mail.  Wimbish used these checks to commit fraud on several banks in the Dallas-Fort Worth area.   Generally, Wimbish and a female companion would forge a stolen check drawn on one account, use a stolen deposit slip to deposit the check into another account, and request cash back from the deposit.   The presentence report (PSR) calculated the face value of the fraudulently deposited checks as $100,944 and the actual loss to the banks as $14,731, which was the amount Wimbish received.

On November 1, 1991, Wimbish pleaded guilty to one count of bank fraud under 18 U.S.C. § 1344 and to one count of possession of stolen mail under 18 U.S.C. § 1708.   The PSR then calculated the offense levels pursuant to the Sentencing Guidelines, U.S.S.G. § 2F1.1 for fraud and U.S.S.G. § 2B1.2 for possession of stolen mail.   Although a different sentencing guideline applies to each count, the grouping rule of U.S.S.G. §§ 3D1.2(d) and 3D1.3 calls for the sentencing court to calculate both guidelines and to apply the one that produces the highest offense level.   Therefore, the PSR calculated both offense levels in order to determine which was higher.

2

Both guidelines enhance the base offense level on a graduated scale according to the amount of the victims' loss. The PSR used the $100,944 face value of the checks, not the $14,731 actually obtained, to determine the amount of loss. For the bank fraud count, the face value of the checks led to enhancing the base offense level of six by six levels, resulting in a total offense level of twelve. U.S.S.G. § 2F1.1(b)(1)(G). For the possession of stolen mail count, the face value caused the PSR to enhance the base offense level of four by eight, also reaching a total offense level of twelve. U.S.S.G. §§ 2B1.2(b)(1) and 2B1.1(b)(1)(I). Because both total offense levels were the same, the PSR simply used the offense level of twelve, coupled with a criminal history category of V. The resulting sentencing guideline range was 27-33 months.

At the sentencing hearing Wimbish objected to the PSR's recommendations. He argued that he intended to defraud the banks only in the amount of cash he actually received. Under his contention, the loss of $14,731 would produce a total base offense level of nine and a sentencing range of 18-24 months. Despite Wimbish's objection, however, the district court adopted the PSR's calculations and sentenced Wimbish to two concurrent terms of 30 months' imprisonment; a two-year and a five-year term of supervised release, to run concurrently; and a $100 mandatory special assessment.

3

## II. DISCUSSION

Wimbish argues on appeal that the district court erred in using the face value of the checks to calculate the loss. He asserts that for bank fraud he did not intend a loss of $100,944. Wimbish also urges that for possession of stolen mail the district court should have fixed the amount of loss at the value of the items stolen. Because he possessed only blank checks, the loss should have been merely the replacement value of the checks, a *de minimis* amount. His assertions, therefore, would result at most in a total offense level of nine, producing a sentencing range of 18-24 months.

We review the application of the Sentencing Guidelines *de novo* and the district court's findings of fact for clear error. United States v. Sanders, 942 F.2d 894, 897 (5th Cir. 1991). Because the calculation of amount of loss is a factual finding, we review that determination for clear error. As long as a factual finding is plausible in light of the record as a whole, it is not clearly erroneous. United States v. Watson, 966 F.2d 161, 162 (5th Cir. 1992).

The Sentencing Guidelines' grouping rule directs the court to apply the highest offense level. U.S.S.G. §§ 3D1.2 and 3D1.3. Consequently, if the court erred in calculating one offense, but not the other, the higher offense level of twelve would still stand, rendering the error harmless. Since we have analyzed both

4

offenses, we give our analysis although we find no error in the calculation of loss for either count.

A. Bank Fraud under U.S.S.G. § 2F1.1

Application Note 7 of U.S.S.G. § 2F1.1 provides guidance on how to determine loss and also incorporates the discussion of loss valuation found in the commentary for § 2B1.1. Application Note 8 of § 2F1.1 further provides that the sentencing court need not determine loss precisely, as long as its estimate is reasonable.

Note 7, however, changed between Wimbish's commission of the offense and the sentencing. Pursuant to 18 U.S.C. § 3553(a)(4), district courts should apply the Sentencing Guidelines in effect on the date of sentencing, unless the guideline in effect on the date of the offense is substantially more favorable to the defendant. United States v. Suarez, 911 F.2d 1016, 1021-22 (5th Cir. 1990). Because there is no *ex post facto* problem here, the guideline effective at Wimbish's sentencing applies.

Before November 1, 1991, Note 7 provided that "if a probable or intended loss that the defendant was attempting to inflict can be determined, that figure would be used if it was larger than the actual loss." U.S.S.G. App. C., 393 (emphasis added). Effective November 1, 1991 (and therefore effective when Wimbish was sentenced in January 1992), the Commission deleted the reference to probable loss. Therefore, amended Application Note 7 directs the

sentencing court to substitute "<u>intended loss</u> that the defendant was attempting to inflict" for the actual loss.  U.S.S.G. § 2F1.1 comment. (n. 7) (emphasis added).  Both versions of Note 7 included the following example:  "[I]f the fraud consisted of . . . representing that a forged check for $40,000 was genuine, the loss would be $40,000."

Wimbish first argues that the district court erred because the amendment of Note 7 authorizes a district court to consider only the intended loss, not the probable loss.  To support his argument, Wimbish refers to <u>United States v. Brigman</u>, 953 F.2d 906, 908 (5th Cir.), <u>petition for cert. filed</u>, --- U.S.L.W. --- (U.S. Aug. 4, 1992) (No. 92-5417).  In <u>Brigman</u>, we considered U.S.S.G. § 1B1.7, which directs courts to treat the commentary to the guidelines "as the legal equivalent of a policy statement."  Section 1B1.7 warns that "[f]ailure to follow such commentary could constitute an incorrect application of the guidelines, subjecting the sentence to possible reversal on appeal."  Wimbish further contends that amendments to a commentary can effectively repudiate prior decisions that were grounded on the former commentary.  <u>United States v. Fitzhugh</u>, 954 F.2d 253, 254 (5th Cir. 1992).  Wimbish also notes that the guideline itself has never defined loss; the commentary has always been the source for the definition and method of calculation.

6

Congress clearly authorized the Sentencing Commission to promulgate policy statements. 28 U.S.C. § 994(a)(2) (Supp. 1992). The Sentencing Commission in turn promulgated its commentaries, giving them the force of policy statements. U.S.S.G. § 1B1.7. Congress then provided that courts must consider the Sentencing Commission's policy statements when imposing sentence. 18 U.S.C. § 3553(a)(5) (Supp. 1992).

Nevertheless, at issue is the weight that a policy statement should carry. Congress has mandated that courts sentence within the guidelines. 18 U.S.C. § 3553(b) (Supp. 1992). No such mandate exists regarding policy statements. Therefore, although courts must consider the commentary, they are not bound by them as they are by the guidelines. THOMAS W. HUTCHISON & DAVID YELLEN, FEDERAL SENTENCING LAW AND PRACTICE 46 (1989). In Brigman, 953 F.2d at 908, we held:

> [T]hese amendments to the commentary were intended by the Sentencing Commission to clarify the operation of § 3E1.1 . . . [I]f Congress sought to create a "rebuttable presumption" surely it would have amended the guideline itself rather than simply the accompanying commentary. . . . [T]he changes in the commentary are plainly more a matter of emphasis than of substantive applicability.

The guidelines themselves limit the binding effect of the commentary. Section 1B1.7 states that the application notes serve both to interpret and explain the guidelines and to detail circumstances that justify departing from them. U.S.S.G. § 1B1.7. Although U.S.S.G. § 1B1.7 states that a court's failure to follow

7

a commentary could result in reversal, the commentary to U.S.S.G. § 1B1.7 undermines the force of that statement. The commentary explains:

> In stating that failure to follow certain commentary "could constitute an incorrect application of the guidelines," the Commission simply means that in seeking to understand the meaning of the guidelines courts likely will look to the commentary for guidance as an indication of the intent of those who wrote them. In such instances, the courts will treat the commentary much like legislative history or other legal material that helps determine the intent of a drafter.

Wimbish attempts to bolster his contention that the commentary's amendment controls this case in his favor by pointing to United States v. Fitzhugh, 954 F.2d 253 (5th Cir. 1992) and its progeny. In Fitzhugh, this court vacated and remanded a sentence for possession of a firearm because of an amendment to the commentary of the career-offender provision, U.S.S.G. § 4B1.2. Under prior caselaw, a sentencing court applying § 4B1.2 could consider a defendant's underlying conduct even when that conduct was not charged in the indictment. The 1989 amendment to the commentary, however, clearly limited consideration to "the conduct set forth in the count of which the defendant was convicted." Fitzhugh, 954 F.2d at 254 (quoting U.S.S.G. § 4B1.2, comment. (n. 2)). Additionally, the 1991 amendment to the commentary expressly excluded the offense of unlawful possession of a firearm by a felon. Id. at 255. Thus, we determined that the Sentencing Commission had repudiated the prior caselaw.

8

Wimbish's case is not at all controlled by Fitzhugh. With regard to § 2F1.1, the Sentencing Commission intended merely to clarify the commentary and to provide "additional guidance with respect to the determination of loss." U.S.S.G. App. C, 393 (emphasis added). Dropping the word "probable" does not constitute the clear change of direction embodied either in the amendments to § 4B1.2 or in Wimbish's argument.

Second, Wimbish argues that the face value of the checks is neither the probable nor the intended loss, but merely a possible loss. The banks were able to detect the fraudulent transactions and stood to lose only the cash that Wimbish received. Therefore, contends Wimbish, the court erroneously calculated the loss value under either version of Note 7.

To buttress his argument, Wimbish points to United States v. Kopp, 951 F.2d 521 (3rd Cir. 1991). Kopp had submitted fraudulent financial information to a lender in order to obtain a $14 million loan. In vacating and remanding for resentencing, the court rejected "possible" loss as an appropriate measure for calculating fraud loss under U.S.S.G. § 2F1.1. The court analyzed the difference between a theft loss and a fraud loss such as that resulting from Kopp's bank-loan fraud. With a theft, the perpetrator intends the loss of the full amount. In fraud, however, the perpetrator might have obtained a loan or contract fraudulently, but still may intend to repay or perform.

9

Even if we were to accept Kopp, its facts do not parallel Wimbish's scheme. Wimbish proffered as genuine a check in the full amount, although he obtained for himself only a portion of the face value of the check. Wimbish put the victims at risk for the full loss, despite the subsequent recovery of the amount Wimbish did not receive. Wimbish's act is thus much more akin to theft than to obtaining a loan fraudulently. If a bank had failed to detect the fraud in a timely manner, the bank's depositor could have withdrawn sums represented by the forged check. Likewise, the owner of an account on which a forged check was drawn might have lost the full check amount by failing to detect the fraud.

Wimbish attempts to distinguish United States v. Hooten, 933 F.2d 293 (5th Cir. 1991). In Hooten, a credit union employee offered to sell a borrower's $1.5 million note back to the borrower for $150,000. Although the employee maintained that his intended victim was the borrower, and not the credit union, we held that $1.5 million was the correct value of the loss because it represented the potential loss to the credit union. Wimbish points out that the Court did not cite the sentencing guideline it was using; that Hooten predates the 1991 amendment to § 2F1.1; and that once Wimbish had deposited the forged checks, he could not obtain any more money from them.

Despite its indirect effect, Hooten is instructive. Hooten stole the note, putting the credit union at risk of losing the

10

entire amount.  Wimbish forged checks, also putting the banks and depositors at risk for the entire loss.  In United States v. Cockerham, 919 F.2d 286, 289 (5th Cir. 1990), we noted in applying § 2B1.1 (cross-referenced by § 2F1.1's Note 7), that loss "includes the value of all property taken, even that recovered or returned." Further, in carrying out his scheme Wimbish acted with conscious indifference to the impact his scheme would have on the victims. His testimony at the sentencing hearing underscored his ignorance and indifference to what would happen to the remaining check amount.  Wimbish's callous indifference to his victims' loss falls within the ambit of intended loss.

The district court's calculation is supported broadly by the caselaw.  We recently held that the intended loss was the full value of insurance claims fraudulently filed, despite the fact that the defendant was paid only a portion of the claims.  United States v. Lghodaro, 967 F.2d 1028, 1031 (5th Cir. 1992).  We also affirmed as intended loss a calculation that included the face value of checks that the defendant had stolen from the mail and forged, but had not yet cashed.  United States v. Quertermous, 946 F.2d 375, 376 (5th Cir. 1991).  The First Circuit has held that possessing or passing forged checks produces an intended loss of the full check amount, regardless of how much the defendant hoped to obtain. United States v. Haggert, --- F.2d ---, No. 91-2293, 1992 WL 337963 (1st Cir. Nov. 20, 1992) (defendant submitted valueless sight drafts to pay a mortgage); United States v. Resurreccion, --- F.2d

11

---, No. 91-2015, 1992 WL 312704 (1st Cir. Oct. 30, 1992) (defendant possessed forged checks that he hoped to sell at a discount). Additionally, the Ninth Circuit affirmed a determination that the defendants intended the loss of a bad check's face value when they attempted to pass the check. United States v. Joetzki, 952 F.2d 1090, 1096 (9th Cir. 1991).

Wimbish effectively stole the checks when he offered the forged documents as genuine. His actions and his conscious indifference put his victims at risk for the entire loss, regardless of how much he actually obtained. Thus the court did not clearly err in calculating the loss value under U.S.S.G. § 2F1.1 as the face value of the checks deposited.

B.  Possession of Stolen Mail and U.S.S.G. § 2B1.2

U.S.S.G. § 2B1.2 incorporates the offense levels of § 2B1.1 and its commentary's discussion of property valuation. Wimbish argues that the appropriate value of theft loss under U.S.S.G. § 2B1.1 is the value of the blank checks. This argument is also without merit. The Commentary to § 2B1.1 provides:

> "Loss" means the value of the property taken, damaged, or destroyed. Ordinarily, when property is taken or destroyed the loss is the fair market value of the particular property at issue. Where the market value is difficult to ascertain or inadequate to measure harm to the victim, the court may measure loss in some other way, such as reasonable replacement cost to the victim. . . . Examples: (1) **In the case of a theft of a check or money order, the loss is the loss that would have occurred if the check or money order had been cashed.**

12

U.S.S.G. § 2B1.1, comment. (n. 2) (emphasis added).  Wimbish contends that the commentary's example applies to the theft of completed checks, not blank checks.  The guideline, however, does not distinguish between stealing a check that is already filled out and stealing a blank check.  In light of the commentary to § 2B1.1, the district court did not clearly err in calculating the total value of the deposited checks as the loss value.

### III.  CONCLUSION

The commentaries to the Sentencing Guidelines are policy statements which help interpret and explain the guidelines.  As such, the commentaries guide but do not bind the sentencing court. We hold that the district court properly calculated loss when it used the face value of the deposited checks instead of the amount Wimbish actually obtained.  Wimbish's sentence accords with the guidelines.

AFFIRMED.