# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 4, 2013

Lyle W. Cayce
Clerk

No. 11-50614

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JASON HEATH MORRISON,

Defendant-Appellant.

Appeals from the United States District Court
for the Western District of Texas

Before STEWART, Chief Judge, and GARZA and ELROD, Circuit Judges.

CARL E. STEWART, Chief Judge:

Defendant-Appellant Jason Heath Morrison ("Morrison") appeals his sentence, challenging the district court's calculation of the loss amount and its application of the sentencing enhancement for "mass-marketing." We AFFIRM.

## I. FACTUAL & PROCEDURAL BACKGROUND

### A.    Mortgage Fraud Scheme

Jason Heath Morrison and his co-defendant, Marcus Rosenberger (collectively, "defendants"), devised and carried out a scheme to defraud homeowners ("Sellers"), home buyers ("Buyers") and mortgage lenders ("Lenders"). In 2009, they formed Vanguard Properties, located in Midland, Texas. They presented themselves as real estate investors who purchased

No. 11-50614

residential properties primarily to re-sell them for a profit, or to "flip" the houses. Morrison obtained from the Midland County Courthouse a list of residential properties that were in foreclosure and scheduled to be auctioned off within the month. He then contacted the Seller in whose name the default mortgage was held. Morrison informed the Seller that he wanted to purchase the property and "flip" it for a profit. He explained that the Seller would not receive any monetary benefit from the sale of his property, but rather, he would simply relinquish it to Morrison. The benefit to the Seller, explained Morrison, was that the residence would not go into foreclosure and the Seller's credit would not be adversely affected.

To avoid the consequences of the "due on sale" clause[1] of the mortgage, the defendants told the Seller not to notify the Lender of the sale of the property. Further, the defendants did not file any documentation that would notify the Lender or the public of the sale. Thus, the Seller still appeared to be the owner of the property in publicly-recorded documents even though the Seller believed the property would be taken out of his name.

After the Seller relinquished the property, the defendants advertised the property in local publications such as the Midland Reporter Telegram and the Thrifty Nickel. The advertisements stated that the home was "for sale by owner" and, sometimes, that "owner financing" was available. When potential buyers responded to the advertisement, Rosenberger met them at the property and presented himself as the owner. Rosenberger told the potential Buyer that there was a great deal of interest in the property and encouraged the Buyer to make an offer as soon as possible. In most cases, the potential Buyers were unable to qualify for traditional financing and sought owner financing through the defendants.

---

[1] The "due on sale" clause usually states that if a borrower sells the property without the Lender's permission, the Lender may declare the full amount of the loan due.

2

No. 11-50614

In the owner financing contracts, the defendants typically required a "balloon payment" from the Buyer, which involved the Buyer making a large down payment and monthly payments for three years, after which time the Buyer was supposed to pay the remaining balance. However, the defendants informed the Buyer that after three years, he would qualify for a traditional mortgage and not need to pay the full remaining balance at once. In addition, the defendants persuaded the Buyer into the purchase by telling him that they would extend the loan agreement at the end of three years if the Buyer was unable to obtain alternative financing. As for the original, outstanding mortgages, the defendants indicated that they would continue to make payments on them directly with the Lenders until paid in full.

Upon convincing the Seller to relinquish his home, the defendants did not pay the Seller's mortgage note as they had promised they would. Instead, once they found a Buyer, they used the money from the sale for their personal benefit. Occasionally, they made a payment on the original mortgage to further delay foreclosure proceedings. This strategy removed the property from the next auction and thus allowed the defendants to continue receiving monthly payments from the Buyer. During the course of the scheme, the Lenders were unaware that the properties had been "sold" or that the defendants were involved with the properties. In addition, the Buyers were unaware that their payments were not being applied to their "mortgages."

To further their scheme, the defendants also communicated with the original Lenders. They represented themselves as the original mortgagors by using information they obtained from the Sellers, such as the Sellers' names, dates of birth, and Social Security numbers, to verify their identities. They then would alter the contact information with the Lenders to Vanguard's address and to Morrison's actual phone number. To continue their scheme, their communications with the Lenders also involved attempts to obtain loan

3

modifications under the federal Home Affordable Modification Program (HAMP). HAMP is designed help homeowners who have defaulted on their mortgages or who are at risk of defaulting by providing financial assistance to offset the homeowners' monthly mortgage payments. HAMP also provides financial incentives to participating lenders and mortgage service companies to modify the terms of eligible loans. In the event that the defendants were unable to obtain a HAMP modification, they inquired about alternative avenues for delaying foreclosure, such as lender-specific programs for reduced monthly payments. In each instance, their intent was to continue to receive the Buyers' money without applying funds to the outstanding mortgages held by the Lenders. The scheme involved a total of nine properties in Midland, Texas.

## B.    Conviction and Sentencing

A grand jury returned a sixteen-count indictment charging the defendants with mail fraud, wire fraud, conspiracy, and aggravated identity theft. Morrison was charged in fifteen of the sixteen counts. Without a plea agreement, Morrison pleaded guilty to the indictment on January 21, 2011.[2] Rosenberger was convicted on all counts following a jury trial.[3]

The district court sentenced Morrison on June 29, 2011. According to the presentence report ("PSR"), Morrison's applicable U.S. Sentencing Guidelines ("U.S.S.G.") calculations reflected a total offense level of 27, which included: 1) a base offense level of 7 for the mail and wire fraud convictions; 2) a 14-level

---

[2] In an unrelated criminal case, Morrison was charged in a one-count indictment with failure to register as a sex offender. Morrison pleaded guilty in both cases, the mortgage scheme to defraud and the failure to register as a sex offender, in a single proceeding. Accordingly, he was sentenced on both convictions in a single proceeding, and his offenses were grouped for purposes of the guidelines calculation. Separate judgments were entered in each case. The sex offender conviction is not at issue in this appeal.

[3] A panel of this court affirmed Rosenberger's convictions and sentence in an unpublished opinion. *See United States v. Rosenberger*, Nos. 11-50621 & 11-50632, 2012 WL 6582509, at *4 (5th Cir. Dec. 17, 2012) (per curiam) (unpublished).

increase for a loss amount of $870,570, U.S.S.G. § 2B1.1(b)(1)(H); 3) a 2-level increase for an offense committed through mass-marketing, U.S.S.G. § 2B1.1(b)(2)(A)(ii); 4) a 2-level increase for an offense involving sophisticated means, U.S.S.G. § 2B1.1(b)(10)(C); and 5) a 2-level increase for obstruction of justice, U.S.S.G. § 3C1.1. The Guidelines were not applicable to Morrison's convictions for aggravated identity theft because the statute of conviction provides for a mandatory, consecutive term of 24 months' imprisonment. *See* 18 U.S.C. § 1028A. Morrison was not awarded points for acceptance of responsibility, U.S.S.G. § 3E1.1, because he fled to Washington to avoid prosecution and attempted to change his identity.

Morrison objected to the loss calculation and the mass-marketing enhancement, both of which he raises on appeal. He also challenged the sentencing enhancements for sophisticated means and obstruction of justice, as well as the PSR's failure to apply the 3-level reduction for acceptance of responsibility.

*1.    Loss Calculation*

The PSR contained a loss calculation in the amount of $870,570. The PSR arrived at this amount by totaling the new sale prices for the nine properties that the defendants sought from the Buyers, *i.e.*, $1,138,000. The PSR calculated that the $34,424.29 paid toward the outstanding mortgages was approximately 23.5% of the $146,337.25 that the defendants received from the Buyers. The remaining 76.5% of value from the new sale prices of the residences, *i.e.*, $1,138,000, was $870,570, and the PSR found this amount to be the loss.

At the sentencing hearing, the defendants, who were represented by separate counsel, both objected to the $870,570 figure contained in the PSR. They argued instead that the court should use the actual loss of $111,912.96, which included $146,337.25 in cash received from the Buyers minus the

No. 11-50614

$34,424.29 paid to the Lenders.  The defendants argued for this actual loss calculation because, in their view, the only "real" victims harmed in the scheme were those Buyers who gave the defendants money and ultimately received nothing in return.  The defendants argued that the Sellers were going to lose the properties anyway, and the banks were in the same position they would have been in without the fraud, *i.e.*, in the process of pursuing foreclosure on those properties.

The Government argued that intended, rather than actual, loss was the appropriate measure of loss in this case, because it was the greater figure.  The Government further asserted that the sale prices of the homes that the defendants set were the best measure of the value of the homes and thus, the appropriate measure of intended loss.  This value amounted to $1,138,000.  The Government maintained that the only reason the actual loss amount was not greater was because law enforcement was able to thwart the defendants' plans before they could actuate the full extent of the intended loss.  Thus, according to the Government, the defendants should not benefit from the much lower actual loss figure simply because their scheme was not as successful as it would have been absent law enforcement's intervention.  The Government alternatively argued that the PSR's loss calculation, in the amount of $870,570, was also reasonable, but that an actual loss amount of $111,912.96 was not.

After hearing this argument, the court solicited information from the parties regarding the value of the first mortgages that were outstanding at the time the defendants became involved with the properties. While this exact value was not available, the parties surmised that the original loan amounts were an appropriate proxy because the homeowners did not own the homes long before they encountered difficulties with paying their mortgages.  The U.S. Probation Officer, who prepared the PSR, produced a spreadsheet which reflected the value of the first mortgages.  The district court then took a recess to confer with the

parties in chambers in order to calculate a loss amount using the information contained in the spreadsheet. Once back on the record, the district court proposed that, instead of the new sale prices, the court would use the value of the first mortgages because this was "a more realistic starting point."

The district court then recited the language of Application Note 3(A) of § 2B1.1, including the definitions for actual and intended loss and the general rule that "loss is the greater of actual loss or intended loss."[4] The district court further stated, "using those definitions, the Court is going to use as set forth in the guidelines the greater of the actual loss and the intended loss." Based on these guidelines, the district court stated that the intended loss in the case would be $769,365, which reflected the total of all the mortgages, $803,789.07, minus the monies the defendants paid to the Lenders, $34,424.29.

The district court next solicited additional argument regarding its proposal. Counsel for both the defendants argued that the district court should reduce the total loan loss amount by the value of the underlying properties. In

---

[4] Citing U.S.S.G. § 2B1.1, app. n.3(A), the court stated:

> I do want to put on the record that under 2B1.1, Application Note 3 states the following: "This application note applies to the determination of loss under subsection (b)(1). General Rule. Subject to the exclusions in subdivision (D), loss is the greater of actual loss or intended loss. 'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense. 'Intended loss' means the pecuniary harm that was intended to result from the offense; [sic] and includes intended pecuniary harm that would have been impossible or unlikely to occur." Then it goes down. "Pecuniary harm means harm that is monetary or that otherwise is readily measurable in money. Accordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm. Reasonable pecuniary harm for purposes of this guideline means pecuniary harm that the Defendant knew, or under the circumstances, reasonably should have known, was a potential result of the offense."

No. 11-50614

making this argument, counsel invoked Application Note 3(E) of U.S.S.G. § 2B1.1, which provides that, in calculating the victims' pecuniary losses for fraud offenses, that amount shall be reduced by the value of the collateral. *See* U.S.S.G. § 2B1.1 app. n.3(E). Specifically, defense counsel urged the court to reduce the total loan amount by the defendants' proposed sale prices for the homes, as the indicator of the value of those homes:

> MR. LOW [defense counsel]: I'm going to make this argument based on Application Note 3(E), Application Note 3(E) to 2B1.1, "Credits Against Loss. Loss shall be reduced by the following:" And it indicates "The money returned, and the fair market value of the property returned." And then I guess it also goes on. And sub (ii), "In a case involving collateral pledged or otherwise provided, the amount the victim has recovered."

Defense counsel argued that because the victims recovered the properties, the new sale prices should be reduced by the value of the collateral to calculate the proper loss amount.

Soon after defense counsel's argument, the following exchange took place between the Government and the district court:

> MR. BERRY [the Government]: Mr. Low was reading to you from [A]pplication Note (E)(i), and he read the beginning of it. I think he just inadvertently glossed over the remaining clause of the first sentence that says, "The money returned, and the fair market value of the property returned and the services rendered" – this is all what the loss shall be reduced by–that was provided "to the victim before the offense was detected." That's not the case here . . . . They don't get credit for the fair market value of those properties, because they were detected. They didn't turn this over prior to. To the extent that the victims managed to salvage in some way, they don't get that credit. And I think he just didn't see that part of the section.

No. 11-50614

> THE COURT: Yeah, and I agree. I think that that section only applies if there was a voluntary return prior, before detection, as is set forth in 2B1.1, the Application Note 3(E). I find this does not apply in this case.

Defense counsel did not respond to this discourse between the Government and the court.

The district court then stated its ruling, finding by a preponderance of the evidence that the total loss amount was $769,365, which the court based on both the evidence adduced at Rosenberger's trial and the evidence proffered at sentencing. The district court explained that "each applicable loan amount manifested intended loss because the Defendants acted with indifference or reckless disregard by exposing the lending agencies . . . to a loss of the total loan without considering whether repayment could ever be made." The court further stated:

> [B]y 2B1.1, using the term "intended loss" instead of "actual loss," the Court finds that the record supports this determination of using the mortgages, as I previously said. And the Court finds the Defendants did, in fact, intend to inflict a loss in the total amount of the fraudulently obtained loans . . . . Here the repayment of these loans, these first mortgages, was in the control not of the Defendants but of the consumers. There is no evidence that the Defendants intended to repay the loans. . . . And the Court finds that the Defendants acted with conscious indifference or recklessness about the repayment of the loans.

In making its rulings, the district court expressly relied on *United States v. Wimbish*, 980 F.2d 312 (5th Cir. 1992), *abrogated on other grounds by Stinson v. United States*, 508 U.S. 36 (1993), and *United States v. Morrow*, 177 F.3d 272 (5th Cir. 1999).

2.    *Mass-Marketing Enhancement*

9

No. 11-50614

The district court then solicited argument from the parties regarding the defendants' objection to the mass-marketing sentencing enhancement. Although the defendants placed the ads in the newspaper, the defendants argued that the enhancement did not apply because "it was a single sale at a single time," not "cumulatively" or "consecutively." The Government argued that case law supported the finding that the use of newspaper advertisements qualifies as mass-marketing, including our decision in *United States v. Magnuson*, 307 F.3d 333, 335 (5th Cir. 2002). Finding that there was evidence that the newspaper was used to solicit potential buyers for the properties, the district court overruled the defendants' objection to this enhancement.

### 3. *Remaining Objections*

The district court sustained Morrison's objection to the acceptance of responsibility credit and applied the 2-level reduction to his offense level. Consequently, the Government made a motion for Morrison to receive the additional 1-level reduction for acceptance of responsibility. The district court overruled Morrison's objections to the enhancements for sophisticated means and obstruction of justice.

### 4. *The Sentence*

The district court adopted the PSR as amended by the court's re-calculation of the loss amount and the 3-level downward adjustment for acceptance of responsibility. Thus, Morrison's amended offense level was 24. Based on his criminal history, Morrison's corresponding guideline range of imprisonment was 63 to 78 months on the mail and wire fraud convictions, and 24 months on the aggravated identity theft convictions. After denying Morrison's request for a downward departure or variance and the Government's request for an upward departure, the district court sentenced Morrison to a total of 87 months' imprisonment and 3 years of supervised release. The court also

No. 11-50614

ordered restitution in the amount of $173,495.79 and a special assessment of $1,500.

Morrison timely appealed.

## II. DISCUSSION

Morrison appeals only the district court's loss calculation and its application of the mass-marketing sentencing enhancement. We address each issue in turn.

### A.     Loss Amount Calculation

#### 1.     *Standard of Review*

We review a defendant's sentence for reasonableness under an abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 49-50 (2007); *United States v. Goss*, 549 F.3d 1013, 1016 (5th Cir. 2008) (citation omitted). Nevertheless, "the district court must still properly calculate the guideline sentencing range for use in deciding on the sentence to impose." *Goss*, 549 F.3d at 1016 (citation omitted). We review calculations of the loss amount and other factual determinations for clear error, and we review legal questions about the interpretation of the Guidelines de novo. *United States v. Tedder*, 81 F.3d 549, 550 (5th Cir. 1996) (citations omitted). Under the clearly erroneous standard, we will uphold the district court's finding so long as it is "plausible in light of the record as a whole. However, a finding will be deemed clearly erroneous if, based on the record as a whole, we are left with the definite and firm conviction that a mistake has been committed." *United States v. Ekanem*, 555 F.3d 172, 175 (5th Cir. 2009) (internal quotation marks and citations omitted).

"[T]he district court cannot achieve absolute certainty in determining . . . losses." *Goss*, 549 F.3d at 1019 (citations omitted). Instead, "[t]he [district] court need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 app. n.3(C); *Goss*, 549 F.3d at 1019 (citations omitted). Moreover, "[t]he sentencing judge is in a unique position to assess the evidence and estimate the

11

loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference." U.S.S.G. § 2B1.1 app. n.3(C) (citations omitted); *United States v. Teel*, 691 F.3d 578, 589-90 (5th Cir. 2012) (citation omitted).

   2.   *Applicable Law*

Under U.S.S.G § 2B1.1, the sentencing guideline range depends upon the amount of financial loss to the victims. The calculated loss shall be the greater of actual or intended loss. U.S.S.G. § 2B1.1, app. n.3(A). "Actual loss" means "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* § 2B1.1, app. n.3(A)(i). "Intended loss" means, *inter alia*, "the pecuniary harm that was intended to result from the offense." *Id.* § 2B1.1, app. n.3(A)(ii)(I).

Further, Application Note 3(E) of § 2B1.1, "Credits Against Loss," provides that "loss shall be reduced by the following":

> (i) The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.
>
> (ii) In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing.

U.S.S.G. § 2B1.1, app. n.3(E)(i)-(ii).

In making its loss determination, the district court here expressly relied on our decisions in *Wimbish*, 980 F.2d 312, and *Morrow*, 177 F.3d 272. The

No. 11-50614

Government also cites our decision in *Tedder*, 81 F.3d 549, for its position, while Morrison cites to *Goss*, 549 F.3d 1013. We discuss the essential facts and holdings of each of these cases before turning to the case *sub judice*.

### a.     *Wimbish*

In *Wimbish*, the defendant deposited forged checks with several banks and received a portion of each deposit as cash back. 980 F.2d at 313. The total face value of the checks was $100,944, and the actual loss to the banks was $14,731, which was the amount Wimbish actually received. *Id.* The district court used the greater amount–the face value of the checks–as the loss amount for calculating Wimbish's guideline range. *Id.* On appeal, we rejected Wimbish's argument that he intended to defraud the banks of only the amount of cash he received, *i.e.*, $14,731. *Id.* We concluded that, "in carrying out his scheme Wimbish acted with conscious indifference to the impact his scheme would have on the victims." *Id.* at 316. We thus reasoned, "Wimbish's callous indifference to his victims' loss falls within the ambit of intended loss." *Id.* Accordingly, we upheld the district court's intended loss calculation. *Id.* at 317.

### b.     *Morrow*

In *Morrow*, the defendants falsified loan applications in order to enable customers to obtain financing for mobile home purchases. 177 F.3d at 285. The district court's calculation of the bank's loss was the total loan amounts that the customers fraudulently procured at each lot. *Id.* at 300. Relying on *Wimbish*, "[t]he district court concluded that each applicable loan amount manifested 'intended loss' because the defendants acted with indifference or reckless disregard by exposing the bank to a loss of the total loan without considering whether repayment could ever be made." *Id.* at 300-01 (citation omitted). On appeal, we concluded that the district court did not err "by using the intended, rather than the actual, amount of loss because the defendants in this case had no control over whether the mobile home consumers would repay the loans." *Id.*

13

at 301. We accordingly upheld the district court's use of intended loss on these facts. *Id.*

### c.     *Tedder*

In *Tedder*, the defendant supplied false social security numbers to his credit counseling clients "to fraudulently obtain [car loans and mortgages] to the full extent of the amounts requested in the loan applications" where the clients likely would not have qualified otherwise. 81 F.3d at 550. In discussing whether actual or intended loss was a more appropriate measure, we stated that, if the defendant intends to repay the loans, actual loss is the appropriate basis. *Id.* at 551 (citations omitted). "However, where the defendant does not intend to repay, and the actual loss is less than the intended loss, only because law enforcement official [sic] thwarted his plans, then the full intended loss is the appropriate basis for calculation." *Id.* (citation omitted). Accordingly, we concluded that the intended, rather than the actual, loss was the appropriate measure and affirmed the district court's intended loss calculation. *Id.*

### d.     *Goss*

In *Goss*, the defendant was a mortgage lender who conspired with others to submit false mortgage applications for borrowers who otherwise may not have qualified for the loans. *Goss,* 549 F.3d at 1014. At sentencing, the district court declined to deduct the value of the underlying collateral and instead used the intended loss (to the lenders) because it was more than the actual loss. *Id.* at 1015-16. On appeal, Goss challenged the district court's loss calculation due to the fact that real property is inherently recoverable and thus should be deducted from the total loan amounts. *Id.* at 1015-16 (citations omitted).

We held that we first must determine whether an actual or intended loss framework is appropriate for calculating the victims' losses. *Id.* at 1016. Moreover, "whether to deduct collateral–whether to employ an actual or an intended-loss calculation–will depend upon the specific facts at hand." *Id.* at

No. 11-50614

1018. Distinguishing *Morrow*, we concluded that Goss was not "so 'consciously indifferent or reckless' about the repayment of the loans as to impute to him the intention that the lenders should not recoup their loans, whether by payment from the borrowers or through recovering the collateral in the event of default." *Id.* (citation omitted). We stated that "[t]his determination rests in large measure on the direction provided by the guidelines' commentary, as well as the common-sense notion that, generally, the value of real, immovable property will be recoverable should the owner default."[5] *Id.* We opined that "control over the repayment of these loans to third parties" is less important "when determining the appropriate loss calculation in a case involving immovable real property, because part, if not all, of the loan value was more likely recoverable." *Id.* However, we also recognized that "there are situations where the deduction of collateral may *not* provide the most fair loss assessment . . . . [f]or example, if a defendant's intent to avoid repaying a loan is sufficiently clear, and recovery of the collateral is problematic." *Id.* at 1017 (citing *Morrow*, 177 F.3d at 301, and *Tedder*, 81 F.3d at 551). We affirmed Goss's conviction but remanded for resentencing for the district court to deduct the collateral's value for the loss calculation. *Id.* at 1019-20.

    3.    *Analysis*

        *a.*    ***Parties' Arguments***

Morrison argues that the district court erred by finding U.S.S.G. § 2B1.1, app. n.3(E), "Credits Against Loss," inapplicable to the facts of this case.

---

[5] We relied on the *Federal Sentencing Guidelines Handbook*, which states that "immovable collateral such as real estate properly pledged to the victim will virtually always be credited against loss." *Goss*, 549 F.3d at 1017 (citing Roger W. Haines, Jr. et al.*, Federal Sentencing Guidelines Handbook: Text and Analysis* 387 (2007 ed.)) (hereinafter *Handbook*). We thus surmised that "[a]n examination of [the guidelines and the *Handbook*], without more, strongly suggests that, for loss-calculation purposes, loan collateral is to be deducted from the total value of the loan." *Id.* (citing *Handbook* at 330 (noting the Guidelines' general "net loss approach")).

15

Specifically, Morrison argues that the district court erred by finding that the "collateral was not returned 'to the victim before the offense was detected,'" because the court relied on the wrong subsection of the guidelines, *i.e.*, subsection (i). Citing to *Goss*, 549 F.3d at 1013, and § 2B1.1, Morrison alleges that, because the district court misread Application Note 3(E)(ii), it failed to properly calculate the intended loss in this case. Morrison argues that, instead, the district court should have deducted the collateral value of each property from each loan's total value. Morrison maintains that, "[d]espite the fact that several of the new purchasers had recovered the houses . . . there was no attempt to determine how much the intended losses might be reduced to offset the recovered collateral."

The Government has acknowledged that the district court may have determined, incorrectly, that U.S.S.G. § 2B1.1, app. n.3(E) was inapplicable to this case. However, the Government relies on *Morrow* and *Tedder* to argue that deduction of the value of collateral may be precluded if a defendant's intent to avoid repaying a loan is sufficiently clear, and recovery of the collateral is problematic. *See Morrow,* 177 F.3d at 301; *Tedder*, 81 F.3d at 551. The Government argues that each of the loan amounts involved manifested intended loss because the defendants: 1) did not intend to repay the loans; 2) did not have control over whether the Buyers repaid the loans; and 3) acted with indifference or reckless disregard by exposing the lending agencies to a loss of the total loan amounts. The Government further argues that deducting the value of the collateral from the loans is inappropriate because it would fail to capture the full scope of the fraud here, which involved several classes of victims, including the Lenders, Sellers, Buyers, and the federal government vis-á-vis the HAMP program.

### b.    *Loss Calculation in Morrison's Case*

No. 11-50614

In light of our circuit precedent, we cannot say that the district court erred by employing an intended loss calculation and declining to account for the collateral's value, especially given the district court's factual findings that the defendants did not intend to repay the mortgage loans here. While the district court appears to have concluded erroneously, under Application Note 3(E) of U.S.S.G. § 2B1.1, that credits against loss only apply where the property is returned prior to detection by law enforcement, any potential error in the court's refusal to apply this guideline on this basis was harmless.[6] *See United States v. Ibarra-Luna*, 628 F.3d 712, 713-14 (5th Cir. 2010).

Harmless error applies to sentencing "if the proponent of the sentence convincingly demonstrates both (1) that the district court would have imposed the same sentence had it not made the error, and (2) that it would have done so for the same reasons it gave at the prior sentencing." *Id.*; *see also United States v. Delgado-Martinez*, 564 F.3d 750, 753 (5th Cir. 2009) (citations omitted) (noting that a procedural error in sentencing is harmless if "the error did not affect the district court's selection of the sentence imposed"). We conclude that the Government, as the proponent of the sentence here, has met its burden. The record more than amply supports the district court's findings that Morrison and his co-defendant intended to cause a total loss of the loan amounts where they had no intent to repay the loans and repayment was in the control of third parties, not the defendants. These findings, in turn, support the district court's decision to use the total value of the loans (minus payments to the Lenders) as

---

[6] Under U.S.S.G. § 1B1.7, the Commentary that accompanies the Guidelines' sections "may interpret the guideline or explain how it is to be applied. Failure to follow such commentary could constitute an incorrect application of the guidelines, subjecting the sentence to possible reversal on appeal." U.S.S.G. § 1B1.7 (citing 18 U.S.C. § 3742). Further, "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson*, 508 U.S. at 37-38; *see also United States v. Nevares-Bustamante*, 669 F.3d 209, 212 & n.4 (5th Cir. 2012) (citation omitted).

17

the intended loss amount. Accordingly, the district court's refusal to deduct the value of the collateral comports with these factual findings, and we are convinced that the district court would have arrived at the same loss calculation absent its misstatement, if any, regarding Application Note 3(E). *See Goss*, 549 F.3d at 1016 ("In making [the] determination [of 'whether the collateral value should be deducted from the loan's total value'], we must first decide whether an actual or intended-loss framework is appropriate for calculating the victims' losses."); *id.* at 1018 ("[W]hether to deduct collateral–whether to employ an actual or an intended-loss calculation–will depend upon the specific facts at hand.").[7]

Significantly, the district court already had proposed an intended loss calculation–reflecting the full amount of first mortgages minus monies paid to the Lenders–before it found that Application Note 3(E) was inapplicable. After reciting the Guidelines' definitions for actual and intended loss and the general rule that "loss is the greater of actual loss or intended loss," the district court stated that it was "going to use as set forth in the guidelines the greater of the actual loss and the intended loss," *i.e.*, the intended loss in the amount of $769,365. The court then stated its findings that: 1) "each applicable loan amount manifested intended loss because the Defendants acted with indifference or reckless disregard by exposing the lending agencies . . . to a loss of the total loan without considering whether repayment could ever be made"; 2) "the repayment of . . . these first mortgages, was in the control not of the Defendants but of the consumers"; and 3) "[t]here is no evidence that the Defendants intended to repay the loans[.]" The record supports these findings.

The record is replete with evidence that the defendants employed multiple tactics to perpetuate their scheme as long as possible. They required substantial

---

[7] We do not express an opinion, however, regarding whether a district court may *never* deduct the collateral's value in an intended loss calculation under *Goss*.

balloon payments from the Buyers, which naturally vested the Buyers in the transactions. The defendants entered into three-year sales contracts with the Buyers and promised to renew those contracts if the Buyers were unable to secure alternative financing. They sought loan modifications through HAMP and lender-specific programs in order to delay the foreclosure process. They also made minimal payments towards the first mortgages to delay foreclosure but otherwise used the proceeds from the Buyers for their personal benefit. All of these actions demonstrate their lack of intent to repay the loans. "[W]here the defendant does not intend to repay, and the actual loss is less than the intended loss, only because law enforcement official [sic] thwarted his plans, then the full intended loss is the appropriate basis for calculation." *Tedder*, 81 F.3d at 551 (citation omitted). The district court thus correctly applied our precedent to this case. *See Wimbish*, 980 F.2d at 316 ("The district court's calculation is supported broadly by the caselaw."). Accordingly, the district court's conclusion that "Credits Against Loss" did not apply to this case was ultimately immaterial, given its decision to use the loss amount equal to the total loan values minus payments to the Lenders. *See Tedder*, 81 F.3d at 551 ("[T]he trial court implicitly found that the seriousness of Tedder's crime justified the calculation of the loss based upon the total of the loan amounts applied for.").

The fact that the collateral underlying the loans here was real property does not alter our conclusion. Despite our recognition in *Goss* that the value of the collateral usually should be deducted from the loan amount, we also acknowledged that "there are situations where the deduction of collateral may *not* provide the most fair loss assessment . . . . [f]or example, if a defendant's intent to avoid repaying a loan is sufficiently clear, and recovery of the collateral is problematic." *Goss*, 549 F.3d at 1017 (citing *Morrow*, 177 F.3d at 301, and *Tedder*, 81 F.3d at 551). The facts of this case are exactly the exceptional circumstances that *Goss* contemplated.

No. 11-50614

In addition to the foregoing facts demonstrating the defendants' intent regarding repayment, the mortgage fraud scheme here was atypical in that it involved several classes of intended victims, including the Buyers, the Sellers, the Lenders, and the federal government.  As the victims who gave Morrison money purportedly to purchase a home and received nothing in return in most cases, the Buyers are the most salient group of victims.  As for the Lenders, the defendants' acts successfully delayed the Lenders' foreclosure sales and prevented the Lenders from recovering their investments or minimizing their losses.  Additionally, the federal government's HAMP program provides financial assistance to distressed homeowners and financial incentives to participating mortgage lenders and services.  In soliciting loan modifications through HAMP, Morrison also intended to defraud the federal government.  Moreover, the Government aptly observed on appeal that the defendants' scheme could make recovery of the collateral problematic, given the potential for title disputes over the properties arising from the defendants' conscious efforts to avoid publicly recording any documents evidencing the transfers.  *See Goss*, 549 F.3d at 1017.  Thus, simply offsetting the value of the collateral from the loan amounts would fail to capture the full scope of the fraud here.  *See* U.S.S.G. § 2B1.1 app. n.3(C) ("The [district] court need only make a reasonable estimate of the loss.").

Above all else, the fact-intensive nature of the inquiry at issue particularly persuades us to heed the Guidelines' instruction that we defer to the district court's loss calculation.  *See* U.S.S.G. § 2B1.1 app. n.3(C) (citations omitted) ("The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence.  For this reason, the court's loss determination is entitled to appropriate deference.").  The district court here was fully engrossed in the facts of this case, as it presided over Rosenberger's trial.  It also deliberated in painstaking detail over the proper loss amount.  Notably, it rejected both the PSR's and the Government's suggested loss calculations,

finding that the first mortgages was a "more realistic starting place." The district court's actions thus bolster our conclusions that its calculation is entitled to significant deference and that any potential error was harmless in this case.

Accordingly, we affirm the district court's loss calculation.

## B.    Mass-Marketing Sentencing Enhancement

Morrison's second argument on appeal is that the district court misapplied the Guidelines when it used the "mass-marketing" enhancement under § 2B1.1(b)(2)(A)(ii) to increase his offense level by two points. He asserts that nine properties were listed in local newspapers on "distinctly separate occasions," and for each listing, they sought only one purchaser for the property. Citing the Application Note for this enhancement, Morrison argues that his plan was not one "to induce a large number of persons" because his scheme involved only nine victims.[8]

As Morrison does not challenge the underlying facts supporting the district court's application of this enhancement, our review is limited to the question of whether the district court correctly interpreted and applied the Guidelines. *See Tedder*, 81 F.3d at 550. Morrison's argument is unavailing, however, in light of our decision in *Magnuson*, 307 F.3d at 335.

In *Magnuson*, the defendant's fraudulent scheme included placing advertisements in grocery store tabloids falsely promising interest-free loans.

---

[8] The Application Note provides in pertinent part as follows:

> For purposes of subsection (b)(2), "mass-marketing" means a plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to (i) purchase goods or services . . . . "Mass-marketing" includes, for example, a telemarketing campaign that solicits a large number of individuals to purchase fraudulent life insurance policies.

U.S.S.G. § 2B1.1, app. n.4(A).

No. 11-50614

307 F.3d at 334.  On appeal, we concluded that Magnuson's actions constituted "mass-marketing" because the newspaper advertisements reached over 300,000 people per week, *i.e.*, "a large number of persons."  *Id.* at 335;  U.S.S.G. § 2B1.1(b)(2)(A)(ii), app. n.4(A).   We thus held that the mass-marketing enhancement "merely requires advertising that reaches a 'large number of persons.'" *Magnuson*, 307 F.3d at 335.  Therefore, the district court did not err in imposing the mass-marketing enhancement to Magnuson's offense level, and we affirmed the district court accordingly.  *Id.*

In the instant case, the defendants used advertisements in newspapers circulated to thousands of people and potentially more through online viewing. In this way, their advertisements reached "a large number of persons."  *See Magnuson*, 307 F.3d at 335.  While the defendants may have phrased their advertisements to sell one house to one person, they solicited thousands of potential buyers in order to find the one buyer for each property.  Consequently, the district court did not err in imposing the mass-marketing enhancement.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's loss calculation and its application of the mass-marketing enhancement to Morrison's sentence.