**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**FILED**

December 13, 2019

Lyle W. Cayce
Clerk

————

No. 18-30815

————

UNITED STATES OF AMERICA,

　　　　Plaintiff - Appellee

v.

DEION A. DURUISSEAU; HAROLD L. LEE,

　　　　Defendants – Appellants

———————————————————————

Consolidated with 18-30822

UNITED STATES OF AMERICA,

　　　　Plaintiff - Appellee

v.

LASHAWN A. DURUISSEAU,

　　　　Defendant – Appellant

————————

Appeals from the United States District Court
for the Western District of Louisiana
USDC No. 1:12-CR-320

————————

No. 18-30815 c/w No. 18-30822

Before JONES, SMITH, and HAYNES, Circuit Judges.

PER CURIAM:*

Deion A. Duruisseau, Lashawn A. Duruisseau, and Harold L. Lee (collectively, "Appellants") appeal their convictions of conspiracy to commit bank fraud and fraud against a financial institution on several grounds. For the reasons explained below, we AFFIRM the convictions. However, we conclude that the loss calculation method used to determine the sentencing ranges was improper, so we VACATE the sentences and REMAND for resentencing.

## I.  Background

This case involves a married couple and a title attorney who were convicted of conspiracy to commit bank fraud and fraud against a financial institution. Deion and Lashawn Duruisseau ran Billionaire Properties ("Billionaire"), a real-estate development company that ostensibly sought to flip homes—that is, the Duruisseaus claimed to purchase properties, remodel them, and sell them at a higher price. The Duruisseaus entered into a partnership with Harold Lee, their title attorney: Lee funded property purchases, served as a closing agent for sales, and had undisclosed financial interests in the properties.

The Duruisseaus solicited buyers—family and friends from church—to purchase investment properties even though the buyers lacked the funds for a down payment. When homes were purchased, the buyers did not actually provide money for the purchase. Instead, the Duruisseaus paid the down payments at closing, leaving the buyers responsible only for mortgage payments. Some buyers purchased several homes under this scheme: Andre

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 18-30815 c/w No. 18-30822

and Marilyn Long, for example, purchased twenty-four homes (and quickly lost them after defaulting on the payments).

To obtain a mortgage, the parties to the transaction must file certain forms. HUD-1 Settlement Statements are forms that require specified information to be disclosed to the lender (here, Wells Fargo or Wachovia Bank). Wells Fargo's form required that the seller pay no more than two percent of the buyer's closing costs and specified that there could be no cash credits to the buyer. Wachovia's form required that the closing agent disclose refunds, repair allowances, the seller's payment of buyer's fees, or similar concessions.

The HUD-1 forms submitted by the Duruisseaus' buyers contained several misrepresentations. The buyers represented that they provided cash at closing even though they did not. Andre Long misrepresented his assets under Deion's direction. Further, the Duruisseaus stated that they were owed tens of thousands of dollars for repairs done on certain homes even though those repairs were actually not completed.

At closings, Lee signed the forms in his capacity as settlement agent.[1] The Duruisseaus also signed the forms, indicating that they were the properties' sellers.

Based on these facts, criminal charges arose. A grand jury initially returned an indictment charging the Duruisseaus with one count of attempted bank fraud. The grand jury then returned a superseding indictment, which added a charge of false statements to a bank. Then, on February 27, 2014, the grand jury returned a second superseding indictment, which charged the Duruisseaus and Lee with: Count One – conspiracy to commit bank fraud

---

[1] Lee was not the closing agent for all of the Duruisseaus' property sales. For example, while Lee was the closing agent for sales involving the Longs (a couple the Duruisseaus knew from church), Lee did not act as the closing agent for the Duruisseaus' sales involving the Akinkugbes (also friends from church).

under 18 U.S.C. § 1349, Count Two – bank fraud against Well Fargo under 18 U.S.C. § 1344, and Count Three – bank fraud against Wachovia under 18 U.S.C. § 1344.  It also charged the Duruisseaus alone with Count Four – making a false statement to Southern Heritage Bank under 18 U.S.C. § 1014.

Appellants filed two pretrial motions for bills of particulars.  The district court granted their motion in part as to Count One, requiring the Government to provide particulars as to (1) all the bank transactions that were part of the conspiracy (and with which Lee was involved); and (2) the dates, times, and places of the conspiracy and the identities of the named co-conspirators.  The court also granted Appellants' motion as to Count Two, requiring that the Government (1) identify all of the fraudulent real estate transactions, (2) specify which fraudulent real estate transactions involved fraud committed by Lee, (3) designate which specific documents contained false or misleading statements for each transaction, and (4) provide the dates and places of the fraudulent transactions.

After a jury trial, Appellants moved for a judgment of acquittal, which the district court granted as to Count Four of the indictment.  Counts One, Two, and Three were submitted to the jury, and the jury returned a verdict of guilty for all three Appellants on those counts.

Appellants filed a post-trial motion for a judgment of acquittal, which the district court granted as to Count Three because the Government had failed to offer proof that Wachovia Mortgage Corporation was insured by the Federal Deposit Insurance Corporation ("FDIC"), which was required to be a "financial institution" for purposes of the bank-fraud statute.  The court denied the motion with respect to Counts One and Two.

Before sentencing, Appellants filed objections to their presentence investigation reports ("PSRs"), including objections to the loss calculations, which affect the offense level used to calculate a defendant's sentencing

guidelines range.    The district court held sentencing hearings for each appellant, and it overruled their objections to the loss calculations and adopted the methods used in the PSRs.    Ultimately, Deion was sentenced to 144 months' concurrent imprisonment, restitution, and a fine.  Lee was sentenced to sixty months' concurrent imprisonment, restitution, and a fine.  Lashawn was sentenced to a day of imprisonment, supervised release conditions including fifty-two weekends in jail, restitution, and a fine.

Appellants now appeal their convictions on several grounds.

## II.  Discussion

### A. Sufficiency of the Evidence to Support Lashawn's Conspiracy Conviction

Lashawn contends that the Government did not proffer sufficient evidence to support an inference that she knowingly assisted a fraudulent scheme.  We review the district court's denial of a motion for a judgment of acquittal de novo but remain "highly deferential to the verdict." *United States v. Velasquez*, 881 F.3d 314, 328 (5th Cir. 2018) (internal quotation marks omitted).  We resolve any credibility determinations, inferences, and conflicts in the evidence in favor of the verdict.  *Id.* at 328–29.  We therefore uphold the conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Imo*, 739 F.3d 226, 235 (5th Cir. 2014) (per curiam) (internal quotation marks omitted).

To support a conspiracy conviction under 18 U.S.C. § 1349, the factfinder must determine, beyond a reasonable doubt, "(1) [that] two or more persons made an agreement to commit . . . fraud; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement willfully, that is, with the intent to further the unlawful purpose." *United States v. Eghobor*, 812 F.3d 352, 362 (5th Cir. 2015) (internal quotation marks omitted).

5

Our inquiry centers on whether sufficient evidence existed to support an inference that Lashawn knowingly assisted in the fraudulent scheme. The mere existence of a "family relationship or other type[] of close association" does not prove a conspiracy. *United States v. White*, 569 F.2d 263, 268 (5th Cir. 1978). Similarly, a defendant who provides leadership for a company may not be convicted simply because the defendant "should have known" that some employees under their oversight were committing fraud. *United States v. Ganji*, 880 F.3d 760, 775–76 (5th Cir. 2018) (emphasis removed). We agree, therefore, that Lashawn's familial relationship with Deion would not support a conviction. On the other hand, direct evidence of involvement in a conspiracy is not necessary, and a jury may base a conviction on exclusively circumstantial evidence. *See Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949).

Here, Lashawn signed Billionaire's articles of organization and identified herself as one of only two members owning the LLC. Then she prepared, signed, and filed Billionaire's annual reports. Moreover, an accountant who prepared personal tax returns for the Duruisseaus and corporate tax returns for Billionaire testified that Deion and Lashawn were "equal partners" and shareholders for Billionaire. At times, the accountant communicated solely with Lashawn, who was "knowledgeable" about Billionaire, to obtain information needed for tax returns. In addition, Agent Pamela McCarthy, who interviewed Lee as part of the investigation, testified that Lee said Lashawn "did in fact play a role" in the scheme, "handled the paperwork," and "was knowledgeable" about Billionaire's business of buying and selling real estate. To be sure, the evidence on this point was not overwhelming, and contradictory evidence existed. For example, at trial, Lee testified that he never saw Lashawn handle paperwork. But we accept the jury's credibility determinations and reasonable inferences. *See Imo*, 739 F.3d at 235.

Resolving inferences in favor of the verdict, the evidence supports a determination that Lashawn handled some financial paperwork for, was knowledgeable about, and was a part owner of Billionaire.  A reasonable juror could draw the inference that a person who co-owns and prepares financial documents for a company would be aware of financial documents showing that the company was paid for home repairs (and would be aware that the company never actually completed the repairs).  A reasonable juror could then conclude that a business's co-owner who is aware that the company is receiving money for never-completed repairs also knew that a fraudulent scheme was underway.

This case is distinguishable from the "should have known" theory we rejected in *Ganji*.  There, we concluded that a person who owned a home health agency could not be convicted on a theory that the nature of her position meant that she should have known that nurses and medical directors were certifying home health treatment for ineligible patients.  *Ganji*, 880 F.3d at 776.  We reasoned that the defendant did not participate in the day-to-day processing of the forms, had no medical training, and received no compensation beyond her salary.  *Id.* at 776–77.

Here, in contrast, Lashawn was not a spouse distanced from the day-to-day operations of her husband's business.  She was a member of the business and involved in its finances.  As one of only two members of Billionaire, she had a direct financial stake in the scheme.  Further, Billionaire's small organizational structure suggests that each of the two members would be involved in the details of the company's transactions in a way that a partial owner of a much larger company may not.  Most significantly, the misrepresentations should have been apparent to Lashawn from the face of the documents.  A reasonable person handling company funds would know if they had paid the down payment on a home or if their company had completed any

identified repairs on a home. This stands in contrast to *Ganji*, where a person whose sole role was reviewing financial documents by themselves would be ignorant of whether a patient's condition warranted certification for home health services.

In sum, enough evidence existed for a reasonable juror to find that Lashawn knew of Billionaire's unlawful purpose. Accordingly, we affirm that sufficient evidence existed to support her conspiracy conviction.

## B. "Knowingly" Jury Instruction

We next consider whether the district court erred when it declined to instruct the jury that it must find that Appellants knew the misrepresentations were both false and material. A district court retains "substantial latitude" in formulating jury charges, and its "failure to give a proposed jury instruction is reviewed for abuse of discretion, subject to harmless error review." *United States v. Jones*, 664 F.3d 966, 978 (5th Cir. 2011). However, if the objection to the jury instruction "hinges on an issue of statutory construction, our review is de novo." *United States v. Brooks*, 681 F.3d 678, 697 (5th Cir. 2012) (internal quotation marks and brackets omitted).

The Supreme Court recently decided *Rehaif v. United States*, which concerned the scope of the word "knowingly" in a federal statute prohibiting certain individuals from possessing firearms. 139 S. Ct. 2191, 2194 (2019). At issue were two statutes: 18 U.S.C. § 922(g), which makes it unlawful for, among others, an alien who is illegally or unlawfully in the United States to possess a firearm; and 18 U.S.C. § 924(a)(2), which provides that a person who knowingly violates § 922(g) may be fined or imprisoned for up to ten years. *Rehaif*, 139 S.Ct. at 2194. The Court determined that the Government must prove that a defendant knew both "that he engaged in the relevant conduct . . . and also that he fell within the relevant status . . . ." *Id.* The Court noted that a longstanding presumption exists that "Congress intends to require a defendant

to possess a culpable mental state regarding each of the statutory elements that criminalize otherwise innocent conduct." *Id.* at 2195 (internal quotation marks omitted). A defendant who did not know that his or her presence in the United States was unlawful could not, therefore, have the required guilty state of mind. *Id.* at 2198.

The statute at issue here—18 U.S.C. § 1344—provides that anyone who "knowingly executes . . . a scheme or artifice . . . (1) to defraud a financial institution; or (2) to obtain any of the moneys . . . of[] a financial institution, by means of false or fraudulent pretenses" shall be fined or imprisoned. The Supreme Court has presumed that Congress intended to incorporate the well settled, common-law meaning of fraud into fraud statutes and therefore reads a materiality requirement into the statutes. *Neder v. United States*, 527 U.S. 1, 23 (1999).

According to Appellants, the district court improperly failed to instruct the jury that it must find that Appellants knew their representations were both false and material. They raised this argument before our court on the eve of oral argument, so it is waived for failure to timely assert it. *See Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994). Even if the argument were not waived, however, we note that the Court did not announce a broad, sweeping approach in *Rehaif*. Instead, it was looking at the issue of an otherwise innocent act—possessing a firearm—made a crime because of the *status* of the individual in possession. *See* 139 S.Ct at 2197. The Court required that the person know the particular status since that is what makes his act illegal. *Id.* Here, while a misrepresentation must be material to be actionable under § 1344, the text of the statute says nothing about materiality, and making intentional misrepresentations to a financial institution is hardly "innocent conduct." Thus, we conclude that *Rehaif* does not alter the relevant law applicable to this statute, and the district court did not err in its instruction.

**C. Sufficiency of the Indictment**

Appellants assert that Count One of the indictment did not describe their offense conduct with sufficient particularity and, accordingly, that the indictment did not conform to constitutional standards.  When, as here, the defendants objected below, we review the sufficiency of the indictment de novo. *United States v. Hoover*, 467 F.3d 496, 498 (5th Cir. 2006).

An indictment's basic function "is to inform a defendant of the charge against him."  *Id.* at 499.  To be sufficient, an indictment "must conform to minimal constitutional standards[,]" meaning it must "allege[] every element of the crime charged and in such a way as to enable the accused to prepare his defense and to allow the accused to invoke the double jeopardy clause in a subsequent proceeding."  *Id.*

Here, the indictment conformed to minimal constitutional standards. Count One of the second superseding indictment informed Appellants of the charge against them, namely conspiracy to commit bank and wire fraud in violation of 18 U.S.C. § 1349, and it specified the underlying substantive offenses.  It also identified the broad timeframe of the offense conduct.  The indictment described the manner and means of the conspiracy and specifically alleged that the Duruisseaus found investors to participate in home-sale closings and made false statements on loan applications and HUD-1 forms.  We have held before that an indictment may be "broad, describing many instances of wire and mail fraud by the defendants" without being "vague or indefinite." *United States v. Simpson*, 741 F.3d 539, 548 (5th Cir. 2014).

Further, Appellants' contention that the indictment was not specific enough to allow them to prepare a defense is unavailing.  An indictment must provide, at a minimum, "a plain concise statement of the essential facts constituting the offenses charged," and it did so here.  *United States v. Gordon*, 780 F.2d 1165, 1172 (5th Cir. 1986).  However, the indictment need not

describe the facts of the offense in detail.  Notably, "a defendant's constitutional *right* to know the offense with which he is charged must be distinguished from a defendant's *need* to know the evidentiary details establishing the facts of such offense, which can be provided through a motion for bill of particulars." *Id.*  Indeed, Appellants obtained a bill of particulars, which provided more precise information about the alleged conspiracy.

In sum, we conclude that Count One of the indictment put Appellants on notice of the charges against them, allowed them to prepare a defense, and contained enough information for them to invoke the double jeopardy clause in a subsequent proceeding.  *See Hoover*, 467 F.3d at 499.  It accordingly conformed to minimal constitutional standards.

## D. Constructive Amendment

Appellants next argue that the district court constructively amended Counts One and Two of the indictment.  Once a defendant has been charged, only a grand jury may broaden or alter the indictment.  *United States v. Thompson*, 647 F.3d 180, 184 (5th Cir. 2011).  "A constructive amendment occurs when the court permits the defendant to be convicted upon a factual basis that effectively modifies an essential element of the offense charged or upon a materially different theory or set of facts than that which the defendant was charged."  *United States v. Chaker*, 820 F.3d 204, 210 (5th Cir. 2016) (internal quotation marks and brackets omitted).  The key question is whether the jury charge broadened the indictment.  *United States v. Griffin*, 800 F.3d 198, 202 (5th Cir. 2015).

If a constructive amendment argument is properly preserved by timely raising it below, we review the issue de novo; if not, we review for plain error. *Chaker*, 820 F.3d at 210, 213.  Under plain error review, we will reverse only if there is a clear and obvious error that affects a defendant's substantial rights and "seriously affects the fairness, integrity, or public reputation of judicial

proceedings." *United States v. Stanford*, 805 F.3d 557, 566 (5th Cir. 2015) (brackets omitted) (quoting *United States v. Olano*, 507 U.S. 725, 735–36 (1993)). The parties do not dispute that the constructive amendment claim for Count Two was not preserved. Lee asserts, however, that he properly preserved his claim for Count One because he objected to the indictment's breadth. Arguing that an indictment is overbroad is distinct from (and perhaps in conflict with) asserting that the jury charge allowed a conviction under a broader range of facts than the comparatively narrow indictment. *See Griffin*, 800 F.3d at 202 ("[T]he key inquiry is whether the jury charge *broadened* the indictment; if it only *narrowed* the indictment, no constructive amendment occurred."). We accordingly determine that Appellants did not raise a constructive amendment claim below and review for plain error.

As to Count One, we find no constructive amendment. According to Appellants, the Government proffered a fraud theory based on underwriting guidelines that was outside the scope of the indictment. However, the Government responds that the underwriting guidelines were meant to show that the misstatements were material. The use of underwriting guidelines did not invite the jury to convict Appellants based on a theory not charged in the indictment. Moreover, the court's jury charge made clear that Appellants were "not here on trial for any act, conduct, or offense not alleged in the superseding indictment" and that "[n]o one in this case is charged with any violations of law specifically regarding the preparation of the HUD-1 outside of the allegations in the superseding indictment."

As to Count Two, Appellants argue that the indictment alleged fraud related to one specific property at 72 Louisiana Avenue. At trial, the Government presented evidence about several additional properties, which properly pertained to the conspiracy charge. The court's charge for Count Two did not specify that 72 Louisiana Avenue was the only property in question.

A limiting instruction regarding properties other than 72 Louisiana Avenue would have been useful when the court charged the jury as to Count Two. However, our review here is limited to plain error, and any error here did not seriously affect the fairness, integrity, or public reputation of judicial proceedings. *See Stanford*, 805 F.3d at 566. The alleged frauds related to properties other than 72 Louisiana Avenue "could have properly been charged in the indictment and [are] prohibited by statute." *United States v. Daniels*, 252 F.3d 411, 414 (5th Cir. 2001). The evidence of frauds at other properties related to conduct charged in Count One, so Appellants were "on notice" that they would be required to defend against such allegations. *Stanford*, 805 F.3d at 566. Notably, the Government presented evidence about 72 Louisiana Avenue at trial, so Appellants cannot show that the jury actually found them guilty based on a broader theory than that charged in the indictment. We accordingly determine that any error did not seriously affect the fairness, integrity, or public reputation of judicial proceedings.

## E. Unanimity Instruction for Count Two

Appellants claim that an element of bank fraud is a materially false statement and that the jury must therefore unanimously agree as to which particular statement was false. Thus, they assert that the jury should have been instructed that it must unanimously agree that a misrepresentation occurred with respect to the specific 72 Louisiana Avenue transaction.

"[A] jury in a federal criminal case cannot convict unless it unanimously finds that the Government has proved each element." *Richardson v. United States*, 526 U.S. 813, 817 (1999). "[T]he jury must agree unanimously and separately" for each element, but it "need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element." *Id.* at 817–19. A preserved objection to the district court's refusal to

13

grant a requested jury instruction is reviewed for abuse of discretion.[2]  *United States v. Sheridan*, 838 F.3d 671, 672 (5th Cir. 2016).

We have stated before that under the wire-fraud statute, "there is no need to instruct a jury that it needs to be unanimous as to a particular false statement within a given wire" because that statute criminalizes "not a particular false statement within a wire, but rather each particular wire that contained a false statement." *United States v. Nanda*, 867 F.3d 522, 529 (5th Cir. 2017).  Similarly, § 1344 criminalizes executing a fraudulent "scheme or artifice" and does not separately criminalize each false statement used in furtherance thereof.  Thus, charges brought under the bank- or wire-fraud statutes are distinguishable from the perjury charges that were at issue in *United States v. Holley*, where we required a particular unanimity instruction for charges brought under a statute criminalizing particular false statements. 942 F.2d 916, 927 (5th Cir. 1991).

Significantly, the indictment in *Holley* alleged multiple theories of liability under a single count.  *Id.*  But here, Count Two of the indictment alleges only one offense, so this is not a situation where the indictment allowed a jury to find the defendants guilty under multiple theories of liability.  For these reasons, we hold that the district court did not abuse its discretion in declining to give a particular unanimity instruction.

## F. Impact of Count Three's Reversal on Count One

Conspiracy and the underlying substantive offense are distinct crimes, so an acquittal on one charge does not require an acquittal on the other.  *United*

---

[2] The Government argues that Appellants failed to preserve this argument.  However, even if Appellants' objection was not identical to the theory asserted here, their unanimity-of-theory objection was sufficient to "give the district court the opportunity to address the gravamen of the argument presented on appeal."  *United States v. Nesmith*, 866 F.3d 677, 679 (5th Cir. 2017) (internal quotation marks omitted).  We therefore determine that the claim was preserved.

*States v. Romeros*, 600 F.2d 1104, 1105 (5th Cir. 1979). "It is well established that acquittal on the substantive count does not foreclose prosecution and conviction for a related conspiracy" as long as the conspiracy conviction is supported by the evidence. *Id.* "[A]n alternative-theory error—i.e., where a jury rendering a general verdict was instructed on alternative theories of guilt and may have relied on an invalid theory—is subject to harmless-error analysis so long as the error at issue does not categorically vitiate *all* the jury's findings." *United States v. Skilling*, 638 F.3d 480, 481 (5th Cir. 2011) (quoting *Hedgpeth v. Pulido*, 555 U.S. 57, 61 (2008) (per curiam)) (internal quotation marks and brackets omitted).

Here, the district court reversed the convictions under Count Three after determining that the Government failed to put forward evidence showing that Wachovia was FDIC insured. According to Appellants, their convictions under Count One should also be reversed. Specifically, they argue that the district court allowed the jury to base their conspiracy convictions on the substantive offense underlying Count Three, which would taint the convictions.

The jury was "properly instructed as to the law"; Appellants' argument is one challenging the "insufficiency of proof"—namely, that the Government did not prove that Wachovia was a financial institution. *Griffin v. United States*, 502 U.S. 46, 58–59 (1991). However, we will not "negate a verdict" simply because there is a chance "that the jury convicted on a ground that was not supported by adequate evidence when there existed alternative grounds for which the evidence was sufficient." *Id.* at 59–60. The Government presented sufficient evidence as to Count Two, as well as additional evidence of the conspiracy. Putting the Wachovia transactions aside, adequate evidence existed to support a conviction on Count One. Therefore, the reversal of Count Three does not necessitate the reversal of Count One.

**G. Witness Testimony Related to Count Four**

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FED. R. EVID. 401. Relevant evidence is admissible unless otherwise precluded by the Rules of Evidence. *Id.* R. 402; *Huddleston v. United States*, 485 U.S. 681, 687 (1988). A court may exclude relevant evidence if the risk of unfair prejudice or misleading the jury, among other things, "substantially outweigh[s]" its probative value. FED. R. EVID. 403. We review a district court's evidentiary rulings for abuse of discretion. *United States v. Tuma*, 738 F.3d 681, 687 (5th Cir. 2013). If an evidentiary ruling was in error, we then subject the ruling to harmless-error analysis and consider whether the error "affected the defendant[s'] substantial rights." *Id.* at 687–88.

Here, after the court granted the motion for acquittal as to Count Four, Appellants objected to the admission of testimony and exhibits related to Count Four into evidence. The court sustained the objection as to the exhibits but overruled it as to the testimony. Lashawn argues that all testimony related to Count Four should have also been excluded because it was probative only as to Count Four and had a prejudicial impact. However, the testimony at issue was relevant to establishing Lashawn's involvement with Billionaire. It was probative of her involvement in the overall scheme and relevant to the conspiracy charged in Count One. A person may be convicted of conspiracy if she acted in furtherance of the conspiracy, even if the person is not shown to have directly participated in an underlying substantive offense. *See Pinkerton v. United States*, 328 U.S. 640, 646–47 (1946). Therefore, even if the Government failed to prove Count Four, evidence of Lashawn's involvement in the scheme could be admissible as to Count One. We thus conclude that the

district court did not abuse its discretion in declining to strike all testimony related to Count Four.

## H. Statute of Limitations

Though the default federal statute of limitations is five years, offenses involving "financial institutions" have a limitations period of ten years. 18 U.S.C. §§ 3282, 3293. Appellants argue that because the Government failed to show that Wachovia was a financial institution, the correct limitations period should have been five years and the jury should not have been allowed to consider any Wachovia-related conduct to support a conspiracy conviction. This was not raised below, and defendants ordinarily cannot raise a statute-of-limitations bar for the first time on appeal. *Musacchio v. United States*, 136 S. Ct. 709, 716–17 (2016). Appellants appear to argue that because their motion for acquittal at trial was denied, they had no opportunity to timely assert their argument. But nothing explains why they were unable to raise this issue in their post-trial motion for acquittal. In sum, Appellants failed to raise a statute-of-limitations argument below and cannot do so now.

## I. Cumulative Error

Appellants claim that we should reverse for cumulative error. We may reverse for cumulative error "only when errors so fatally infect the trial that they violated the trial's fundamental fairness." *United States v. Delgado*, 672 F.3d 320, 344 (5th Cir. 2012) (en banc) (internal quotation marks omitted). This is not an "unusual case in which synergistic or repetitive error violate[d] the defendant[s'] constitutional right to a fair trial." *Id.* In fact, we have identified only one potential error that occurred during the trial: the district court should have specified in its jury instruction that Count Two referred only

17

to 72 Louisiana Avenue.[3] We do not find that any litany of errors undermined the trial's fundamental fairness, and so we decline to reverse on this ground.

**J. Loss Calculation**

We review the district court's application of the U.S. Sentencing Guidelines de novo and its findings of fact at sentencing for clear error. *United States v. Hinojosa*, 749 F.3d 407, 411 (5th Cir. 2014). "Issues related to a defendant's sentence are reviewed for reasonableness" using a two-step process: we first "ensure that the district court committed no significant procedural error" and then "consider the substantive reasonableness of the sentence imposed." *United States v. Claiborne*, 676 F.3d 434, 437 (5th Cir. 2012) (per curiam) (brackets and internal quotation marks omitted). When determining loss, the district court need not achieve "absolute certainty." *United States v. Morrison*, 713 F.3d 271, 279 (5th Cir. 2013). It therefore "need only make a reasonable estimate of the loss." *Id.* (quoting U.S.S.G. § 2B1.1 app. 3(C)). Because the district court "is in a unique position to assess the evidence and estimate the loss," the sentencing judge's determination "is entitled to appropriate deference." *Morrison*, 713 F.3d at 279 (quoting U.S.S.G. § 2B1.1 app. 3(C)).

The district court adopted the recommendations in Appellants' PSRs that loss be calculated by adding together the down payments for each transfer of property. The PSRs recommended this method of calculation because the down payments were a "common thread" throughout the property transfers, and the probation officer concluded that the typical method—loan value minus payments toward the principal—was unfeasible. Specifically, this case diverges from typical bank fraud cases because Appellants did not falsely apply for loans in their own name but instead obtained loans in others' names, which

---

[3] However, we also determined that any error there did not amount to plain error. *See* Section II.D., *supra.*

left the buyers with unmanageable debt. Appellants argue that calculating loss based on down payments had no logical connection to actual or intended loss because the calculation was based on payments made to the lenders and not money taken from victims. We agree.

Although there are situations where a net-loss calculation "may not provide the most fair loss assessment," when real property is involved, actual loss (usually, net loss) is likely to be the appropriate method of calculation. *See United States v. Goss*, 549 F.3d 1013, 1017–18 (5th Cir. 2008). Under the Sentencing Guidelines, actual loss means "reasonably foreseeable pecuniary harm," which is "harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." U.S.S.G. § 2B1.1 cmt. 3(A)(i),(iv). In this case, we see no reason why the district court could not determine actual loss to the banks by a traditional net-loss calculation—that is, the total of the amounts loaned but not recouped. The district court stated that some lenders were unable to provide the information, but that seems to weigh against holding the defendants responsible for money that cannot be proven to have been lost. That is, if the bank received the money, either from the borrower or by selling the property, it was not an actual loss. To suggest that the down payments actually made (even if the source was fraudulently stated) were "intended loss" equally makes no sense.

The PSRs' recommendations appeared to deviate from the traditional net-loss calculation because the buyers—not just the banks—suffered financial harm. To be sure, loss calculations may properly include losses to the buyers and are not limited to losses by financial institutions. This follows from the Sentencing Guidelines' definition of a victim, which can be any person who suffered actual loss. U.S.S.G. § 2B1.1 app. 1; *see also United States v. Hoffman-Vaile*, 568 F.3d 1335, 1343–44 (11th Cir. 2009) (affirming a loss calculation that included losses to private insurers and patients after a defendant was

convicted of defrauding Medicare).   Calculating the losses sustained by the buyers may require some estimation, which is permissible.  *See Morrison*, 713 F.3d at 279.

However, the sum of the down payments was not a reasonable way to estimate the loss.  The down payments did not come from the buyers' assets and thus could not have been lost by the buyers.  The down payments were paid to the banks, so they were not lost by the banks either.  For these reasons, we hold that the loss calculation must have a closer nexus to the actual or intended loss.  We therefore conclude that the district court erred in its application of the Sentencing Guidelines.

The Government argues that any error was harmless because using the methodology advocated by the Duruisseaus as applied by the district court would result in a number within the same monetary range as that found by the district court, thus failing to alter the Guidelines calculations.  To sustain a claim of harmless error, the Government must show that the same sentence would have been imposed absent the error, using one of the methodologies described in *United States v. Richardson*, 676 F.3d 491, 511 (5th Cir. 2012). However, the district court did not analyze the actual loss along the lines described above.  It is not clear, therefore, that the loss amount will remain within the same guidelines range when loss is recalculated in a way consistent with this opinion.  We vacate the sentences and remand for resentencing.[4]

Although we are remanding for resentencing, we disagree with the other contention Lee made to the effect that district court impermissibly included non-criminal conduct in the loss calculation, specifically because the calculation included transactions that could not sustain a bank-fraud

---

[4] Because we are remanding for resentencing, we note that the amount attributable to Count Four should not be included in the loss amount.  For real property, actual loss is typically the best way to calculate loss, and Southern Heritage did not suffer loss.

conviction as the Government had failed to establish that the lenders were FDIC-insured.  Uncharged conduct and facts underlying acquitted charges can be "'relevant conduct' and thus may be used in determining loss amount if it is part of the 'same course of conduct' or 'a common scheme or plan' as the offense of conviction," so long as the district court determines that the conduct has been proven by a preponderance of the evidence.  *United States v. Cooks*, 589 F.3d 173, 185 (5th Cir. 2009) (quoting U.S.S.G. § 1B1.3 cmt. 9); *see also United States v. Valdez*, 453 F.3d 252, 264 (5th Cir. 2006) (discussing a sentencing judge's consideration of conduct underlying an acquitted charge).  Here, the district court considered transactions that were part of a common scheme or plan to obtain loans in other buyers' names using fraudulent HUD-1s. Moreover, the district court set aside Appellants' Count Three convictions because the Government's evidence at trial showed that Wachovia *Bank* was FDIC insured, but the indictment alleged fraud of Wachovia *Mortgage Corporation*.  The Government failed to show that the Bank's coverage extended to the Mortgage Corporation, which created an "evidentiary chasm." However, the issue was one of proof, and nothing suggests that Appellants' statements made to Wachovia would not have been within the ambit of the federal bank-fraud statute if properly proved.  The district court acted reasonably when it included the relevant conduct in the loss calculation.

### III.  Conclusion

For the foregoing reasons, Appellants' convictions are AFFIRMED. Because we determine that the district court's loss calculation method was an impermissible application of the Sentencing Guidelines, we VACATE the sentences and REMAND for resentencing consistent with this opinion.